UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| RONALD E. BALL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:12-CV-00369 |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Ronald Ball appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[2] (Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Ball applied for DIB in October 2009, alleging disability as of June 24, 2008. (Tr. 162-71.) The Commissioner denied his application initially and upon reconsideration, and Ball requested an administrative hearing. (Tr. 90-93, 125-30.) On April 7, 2011, a hearing was conducted by Administrative Law Judge ("ALJ") John Pope, at which Ball, who was represented

---

[1] Although Plaintiff brought this suit against Michael J. Astrue, the former Commissioner of Social Security, Carolyn W. Colvin became the Acting Commissioner on February 14, 2013. As such, under Federal Rule of Civil Procedure 25(d), Colvin is automatically substituted as a party in place of Astrue. Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (Docket # 16); *see* 28 U.S.C. § 636(c).

by counsel, and a vocational expert ("VE") testified. (Tr. 34-78.)  On July 14, 2011, the ALJ rendered an unfavorable decision to Ball, concluding that he was not disabled because he could perform a significant number of jobs in the economy despite the limitations caused by his impairments. (Tr. 16-29.)  The Appeals Council denied his request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-12, 79-86, 264-81.)

Ball filed a complaint with this Court on October 22, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.)  In this appeal, Ball argues that the ALJ: (1) improperly discounted the credibility of Ball's mental health symptom testimony; and (2) failed to adequately incorporate Ball's moderate difficulties in concentration, persistence, and pace into the RFC and the hypothetical posed to the VE. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 6-11.)

## II.  FACTUAL BACKGROUND[3]

### A. Background

At the time of the ALJ's decision, Ball was forty-seven years old, had a high school education, and had worked as an automobile assembler for Chrysler Corporation from 1997 to June 2008; he also had past work experience as a surgical support health aide. (Tr. 41, 164, 262, 399.)  Ball alleges that he is disabled due to degenerative disc disease, sleep apnea, post traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), and depression. (Opening Br. 2.)  Because he challenges only the ALJ's findings concerning his mental impairments (Opening Br. 2 n.1), the Court will focus on the evidence pertaining to Ball's mental, rather than physical, limitations.

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 1,151-page administrative record necessary to the decision.

At the hearing, Ball stated that he lived with his girlfriend in a mobile home. (Tr. 40.) He was laid off from his assembler job at Chrysler in 2008; he applied for other jobs but was unsuccessful. (Tr. 42-45.) Ball is independent with his self care and goes shopping alone if needed; he also visits his mother each week. (Tr. 53-54, 58.) In his spare time, Ball enjoys going to the shooting range; riding his motorcycle; and serving as the quartermaster of the local VFW, which involves financial management. (Tr. 54, 59, 69.) In a typical day, Ball rises early and packs his girlfriend's lunch, but then usually lies back down. (Tr. 50-51.) By mid-morning, he performs household chores, including laundry, vacuuming, and unloading the dishwasher; and watches television. (Tr. 51-52, 54.) Once his girlfriend returns home, they fix dinner or go out to eat and then watch television. (Tr. 52-53.)

When asked about how his psychological conditions affect his ability to work, Ball stated that he used to feel anxious just getting out of the car at work, as well as "hyper," which others mistook for anger. (Tr. 55-56, 70.) He added that he would have an absenteeism problem and difficulties with concentration, but no problem getting along with others. (Tr. 59, 70-71.) He had been receiving treatment for his psychological conditions through the Veterans' Administration ("VA") since 2005. (Tr. 56.) Currently, he was seeing a VA psychologist two to three times a month and a psychiatrist once a month, and participating in a PTSD group. (Tr. 56-57.)

### B. Summary of the Relevant Medical Evidence

In March 2007, Ball underwent a mental status exam by Dr. Elizabeth Martin, a psychiatrist, at the VA. (Tr. 833-34.) His mood, insight, and judgment were fair, and his thought process ruminative. (Tr. 834.) He reported a suicidal thought from the night before, but otherwise none in the past several weeks. (Tr. 834.) No psychosis or suicidal plan or intent were

3

noted. (Tr. 834.)  He admitted that he drinks beer, but was adamant that he would not return to hard liquor, fearing it would lead to a black-out or hurting someone. (Tr. 834.)  Dr. Martin assessed that Ball had depression and possible PTSD and ADHD, and adjusted his medications. (Tr. 834.)  Dr. Martin, or another VA psychiatrist, saw Ball approximately twenty-five times from January 2007 to December 2010. (Tr. 517, 607, 630, 633, 666, 677, 758, 768, 904, 907, 924, 940, 979, 1000, 1025, 1044, 1049, 1057, 1062, 1070, 1077-79.)  He was assigned Global Assessment of Functioning ("GAF") scores ranging from 55 to 65, reflecting moderate or mild mental health symptoms, in 2008 to 2010.[4] (Tr. 383-85, 666, 758, 768.)

In January 2007, Ball began seeing Birgette Miller, a psychologist, for fifty-minute sessions of psychotherapy. (Tr. 854.)  He saw her approximately 120 times from January 2007 to March 2011. (Tr. 426, 441, 448, 464, 467, 469, 471, 477, 485-86, 488, 507, 510, 514, 520, 530, 532, 534, 598, 604, 609, 612-13, 616, 621, 625, 644, 647, 653, 658, 661-62, 664, 670-71, 673, 675, 680, 682, 687, 690, 741-42, 745, 750, 754, 761, 773, 779, 783, 786, 789, 793, 797, 805, 827, 829-30, 840-42, 846, 850, 854, 891, 893-94, 900, 902, 908-09, 914, 925, 933, 935-39, 942, 965, 970, 978, 986, 988, 990, 992, 995, 997-99, 1002, 1004, 1011, 1022, 1024, 1028, 1031, 1033, 1035, 1038-39, 1043, 1045, 1047, 1056, 1059, 1060, 1066, 1068-69, 1076, 1079.)

Dr. Miller assigned Ball GAF scores ranging from 56 to 64, reflecting moderate or mild symptoms, in 2007 to 2009. (Tr. 383-85.)  During several visits from February 2010 through March 2011, she administered the Beck Depression and Beck Anxiety tests to Ball, and he

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000).  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*  And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

consistently scored in the "severe" category. (Tr. 599, 645, 648, 651, 656, 774, 783, 794.) Dr. Miller periodically encouraged Ball to pursue work, vocational rehabilitation, and volunteer opportunities. (*See, e.g.*, Tr. 491, 516, 521, 806, 937.)

In June 2007, Ball was hospitalized in the psychiatric unit at the VA for two weeks after having suicidal ideation. (Tr. 1102-04.) During his hospitalization, he complained of symptoms of depression, hypomania, mood swings, and anxiety. (Tr. 1103.) By discharge, Ball's mood, insight, and judgment were good; his affect appropriate; and his thought processes logical and sequential. (Tr. 1103.) He denied suicidal ideation. (Tr. 1103.)

In January 2009, Gerald Vasily, Ph.D., performed a mental status examination on Ball at the VA. (Tr. 391-409.) After reviewing Ball's mental health history, including alcohol dependence, Dr. Vasily concluded that Ball's mental health problems appeared to be of "mild to moderate severity." (Tr. 400-01.) During the session, Ball appeared relaxed and in no distress, but became tearful when talking of relationships; his mood was depressed with congruent affect. (Tr. 406.) His insight, judgment, and comprehension appeared intact and in the average range; his speech patterns were logical, relevant, coherent, and goal directed. (Tr. 406.) Ball denied any hallucinations, delusions, thought disorders, or suicidal or homicidal ideations. (Tr. 406-07.)

Dr. Vasily diagnosed Ball with depressive order, not otherwise specified; alcohol dependence (in early remission); ADHD (by history); and dysfunctional personality traits with dependent features. (Tr. 408.) He concluded that Ball did not meet the criteria for bipolar disorder, and also disputed Dr. Martin's diagnosis of PTSD because he "could not find any discussion of the rationale in [her] progress notes." (Tr. 408.) Dr. Vasily thought that Ball's depressive disorder "affected his functioning in the workplace to a mild degree." (Tr. 408.)

5

On December 8, 2009, Ball underwent a mental status examination by Candace Martin, Psy.D., at the request of Social Security. (Tr. 562-66.)  His mood strongly reflected anxiety and depression with notable discouragement, and he cried and fidgeted frequently. (Tr. 564.)  His performance on the mental status examination and his cognitive skills were generally within normal limits; he did, however, exhibit relative weakness in verbal concept formation and short term memory, which seemed to be related to difficulty with concentration, possibly related to ADHD. (Tr. 565.)  She concluded that "his ability to function independently seems to be disturbed generally only in terms of his physical complaints." (Tr. 565.)  Dr. Martin further opined:

> His [PTSD] does not appear to be a significant limiting factor in his ability to engage in tasks during the day.  His sleep problems would certainly have a notable affect upon his ability to drive or handle dangerous machinery.  He does not report specific symptoms of ADHD, which would negatively affect his ability to work, although there are likely to be some symptoms of ADHD which may be more apparent to others that he is not identifying to.  He does not show any significant cognitive factors that would affect his ability to function in most jobs.

(Tr. 565-66.)  Dr. Martin assigned Ball a GAF score of 55 and diagnosed ADHD, combined type; depressive disorder, not otherwise specified; specific phobia–claustrophobia; generalized anxiety disorder; and alcohol abuse, in remission. (Tr. 566.)

On January 27, 2010, F. Kladder, Ph.D., a state agency psychologist, reviewed Ball's record and concluded that his mental impairment was not severe. (Tr. 580-92.)  He opined that Ball had mild restrictions in daily living activities; social functioning; and concentration, persistence, or pace; and no episodes of decompensation. (Tr. 590.)  More specifically, after summarizing Dr. Martin's December 8, 2009, evaluation findings, Dr. Kladder wrote that Ball's activities of daily living did not appear to be significantly limited by any mental disorder; he

6

socializes adequately with others; and he is able to take care of the house and pursue leisure interests. (Tr. 592.)  Dr. Kladder's opinion was later affirmed by a second state agency psychologist. (Tr. 595.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility," or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### IV.  ANALYSIS

#### A.  *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in

7

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On July 14, 2011, the ALJ issued the decision that ultimately became the

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

Commissioner's final decision. (Tr. 16-29.)  He found at step one that Ball had not engaged in substantial gainful activity after his alleged onset date and at step two that he had the following severe impairments: degenerative disc disease, sleep apnea, anxiety, ADHD, and depression. (Tr. 18.)  But the ALJ determined at step three that Ball's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 19-20.)

Before proceeding to step four, the ALJ assigned Ball the following RFC: "[T]he claimant has the residual functional capacity to perform sedentary work . . . except the claimant can occasionally climb.  He can frequently balance, stoop, kneel, crouch and crawl.  He is limited to unskilled work." (Tr. 20.)  Based on this RFC and the VE's testimony, the ALJ concluded at step four that Ball was unable to perform any of his past relevant work. (Tr. 27.)  The ALJ then concluded at step five that he could perform a significant number of unskilled, sedentary occupations within the economy, including order clerk, assembler/inspector, and packager. (Tr. 28.)  Accordingly, Ball's claims for DIB were denied. (Tr. 29.)

*C. The ALJ's Credibility Determination Will Be Remanded*

Ball argues that the ALJ cherry-picked the evidence when assessing the credibility of his mental health symptom testimony.  Ball's argument is persuasive as the ALJ failed to address important evidence that contradicted his finding.

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v.*

*Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

"The Court is mindful that the standard of review on a challenge to a credibility finding is highly deferential." *Wilson v. Astrue*, 836 F. Supp. 2d 816, 820 (S.D. Ind. 2010). But the deference afforded to an ALJ's credibility determination "also presumes that the ALJ followed the requirements that governed the ALJ's credibility determination." *Id.* One requirement is that the "ALJ has the obligation to consider *all* relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Id.* (emphasis in original) (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)).

Here, the ALJ found Ball's mental health symptom testimony not credible to the extent it was inconsistent with the assigned RFC for unskilled work. (Tr. 22.) One of the primary reasons that the ALJ discounted Ball's symptom testimony was his conclusion that Ball's "treatment ha[d] been generally successful in controlling his symptoms." (Tr. 25; *see also* Tr. 27.) In that respect, the ALJ characterized Ball's mental status exams as largely "unremarkable," reciting that there "was no suicidal ideation and no psychosis" and Ball's "[t]hought process was logical and thought content was appropriate." (Tr. 24.) The ALJ also observed that Ball had not been hospitalized for his psychiatric concerns since his alleged onset date. (Tr. 24.) In summarizing the treatment notes from Dr. Miller, Ball's treating psychologist, the ALJ opined that Ball's "medication regimen continues to effectively control his depression, anxiety, and ADHD." (Tr.

24 (citations omitted).)

But the ALJ "was in fact, selective in his discussion and interpretation of the facts, and such cherry-picking was error." *Wilson*, 836 F. Supp. 2d at 820.  To explain, Dr. Miller administered the Beck Depression and Beck Anxiety tests on Ball at various intervals from February 2010 through March 2011, and the results *repeatedly* reflected that his depression and anxiety symptoms remained at the "severe" level during that period despite Ball's treatment. (Tr. 599, 645, 648, 651, 656, 774, 783, 794); *see* Aaron T. Beck, Robert A. Steer, & Gregory K. Brown, *Beck Depression Inventory,* http://academicdepartments.musc.edu/family_medicine/rcmar/beck.htm (last visited Feb. 27, 2014).  The ALJ did not address this evidence, and thus, it is not clear if he discounted it, ignored it, or simply overlooked it. *See Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996) (stating that the court must be assured "that the ALJ considered the important evidence"); *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) ("An ALJ may not select and discuss only that evidence that favors his ultimate conclusion . . . .").

Of course, as the Commissioner emphasizes, an ALJ "need not provide a written evaluation of every piece of evidence that is presented." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).  But where an ALJ "ignore[s] an entire line of evidence, that . . . fall[s] below the minimal level of articulation required." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993); *accord Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).  The results of the Beck Depression and Beck Anxiety tests are important evidence contradicting the ALJ's conclusion that Ball's treatment was successfully controlling his mental health symptoms in 2010 and 2011. "[W]hen there is reason to believe that an ALJ ignored important evidence–as when an ALJ fails

to discuss material, conflicting evidence–error exists." *Walters v. Astrue*, 444 F. App'x 913, 917 (7th Cir. 2011) (unpublished); *see Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected.").

Admittedly, the ALJ cited other bases for his credibility determination that are supported by the record, including that Dr. Miller "encouraged him to look for work and pursue further education through vocational rehabilitation" (Tr. 25; *see also* Tr. 26), and that Ball "stopped working due to a business-related layoff rather than because of the allegedly disabling impairments" (Tr. 27). *See* SSR 96-7p, 1996 WL 374186, at *5 (directing the ALJ to consider a claimant's "prior work record and efforts to work" as part of the credibility determination); *see, e.g.*, *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (considering claimant's work history when discounting his credibility). Therefore, the ALJ's decision to discount the credibility of Ball's mental health symptom testimony is not without some basis. Yet, these other reasons fail to assuage the Court's concern about the ALJ's *significant* reliance on his cherry-picked finding that Ball's treatment was successfully controlling his mental health symptoms. *See, e.g.*, *Ryan v. Astrue*, No. 1:12-cv-43, 2013 WL 791070, at *8 (N.D. Ind. Mar. 1, 2013) (remanding credibility determination where the majority of the reasons that the ALJ relied on in discounting claimant's credibility were flawed).

In the face of the ALJ's selective reasoning, the Court cannot find that the ALJ met his duty to consider all of the relevant mental health evidence when assessing the credibility of Ball's mental health symptom testimony. Accordingly, a remand is in order. *See, e.g.*, *Wilson*, 836 F. Supp. 2d at 821.

### *D. The ALJ Should Revisit the Mental RFC Upon Remand*

After acknowledging at step two that Ball's ADHD, anxiety, and depression were "severe" impairments (Tr. 19), the ALJ concluded at step three that Ball had moderate difficulties in concentration, persistence, or pace (Tr. 20). The ALJ observed, however, that "[o]n medications [Ball's] focus was better." (Tr. 20.) The ALJ then ultimately concluded: "Given the overall evidence, . . .with medication and treatment the claimant would be able to perform unskilled work." (Tr. 20.) Accordingly, the ALJ posed a hypothetical to the VE at step five limiting the individual to "unskilled work." (Tr. 73.)

But the ALJ's limitation to "unskilled work" may not be an adequate means of addressing Ball's difficulties in maintaining concentration, persistence, and pace. *See, e.g.*, *Miller v. Colvin*, No. 1:11-cv-1186, 2013 WL 796722, at *4 (S.D. Ind. Mar. 1, 2013) (concluding that a limitation to "simple, repetitive work" did not adequately account for the claimant's deficits in concentration, persistence, and pace). The Seventh Circuit Court of Appeals "ha[s] stated repeatedly that ALJs must provide vocational experts with a complete picture of a claimant's [RFC], and vocational experts must consider 'deficiencies of concentration, persistence, and pace.'" *Jelinek v. Astrue*, 662 F.3d 805, 813 (7th Cir. 2011) (citations omitted). That is, "[w]hen an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record." *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). "More specifically, the question must account for documented limitations of 'concentration, persistence, or pace.'" *Id.* (citations omitted).

Therefore, "for most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on

these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 621-20 (7th Cir. 2010); *see, e.g.*, *Miller*, 2013 WL 796722, at *4 (concluding that the case fell within the scope of "most cases" and that the restrictions on concentration, persistence, and pace should have been included in the hypothetical). Accordingly, the VE "should have been informed of the concentration, persistence and pace limitation to evaluate how that would effect [Ball's] ability to perform basic work activity on a regular and continuing basis." *Miller*, 2013 WL 796722, at *4 (collecting cases). The ALJ is encouraged to do so upon remand.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Ball and against the Commissioner.

SO ORDERED.

Enter for this 28th day of February, 2014.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge
